UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA

  - v. -

ADAM WEIBLING,

                Defendant

_____

:
:
:
:
:
:
:
:
:

21 Cr. 00644 (RDM)

**<u>REDACTED SENTENCING MEMORANDUM ON BEHALF OF ADAM WEIBLING</u>**

Bruce H. Searby (DC #1012382)
SEARBY PLLC
2000 P Street, NW, Suite 705
Washington, D.C. 20036
Tel: (202) 750-6106
Fax: (202) 849-2122
bsearby@searby.law

COUNSEL FOR DEFENDANT
ADAM WEIBLING

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A. Events Leading Mr. Weibling Up the Capitol Steps . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. Events From the Capitol Steps, into the Capitol Building . . . . . . . . . . . . . . . . . . . . .  4

    C. Mr. Weibling's Continued Presence Inside the Capitol Building . . . . . . . . . . . . . . . .11

    D. Mr. Weibling's Other Good Deeds Outside the Capitol Building . . . . . . . . . . . . . . .. 14

APPLICABLE LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

THE PRESENTENCE INVESTIGATION REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A SENTENCE OF PROBATION WOULD ACCORD WITH SECTION 3553(a) . . . . . . . . . .17

    A. Mr. Weibling's History and Circumstances Weight in Favor of Probation . . . . . . . .. 17

        1. Family relationships and mutual support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        2. Commitment to personal development, self-reflection, church, and work . . . .19

    B. The Nature and Circumstances of the Offense Support a Term of Probation . . . . . . . 21

        1. Mr. Weibling's role in the events of January 6 was minor, unplanned, and
        largely well-intentioned . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        2. Mr. Weibling accepts responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    C. A Term of Probation Would Provide Just Punishment, Reflect the Seriousness of the
    Offense, and Promote Respect for the Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    D. A Term of Incarceration Will Not Materially Promote Deterrence . . . . . . . . . . . . . .24

    E. A Sentence of Probation Would Prevent Sentencing Disparities. . . . . . . . . . . . . . . . . 25

MR. WEIBLING WILL PAY RESTITUTION AND A FINE IS INAPPROPRIATE . . . . . . . .27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

Defendant Adam Weibling, through undersigned counsel, respectfully submits this **redacted** sentencing memorandum to request that the Court impose a short term of probation and not impose any incarceration or home confinement.

Mr. Weibling pleaded guilty on July 14, 2022 to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). He will be before this Court for sentencing on April 12, 2023. As set forth below, we respectfully submit that a short term of probation would be just and appropriate under the circumstances of this case in accordance with 18 U.S.C. § 3553(a) — taking into account Mr. Weibling's decade-long commitment to self-improvement and his strong family connections and obligations.

I.   <u>**INTRODUCTION**</u>

Adam Weibling will stand for sentencing before the Court having taken, in his words, a "humbling journey of self-discovery" to conclude that he broke the law amidst "the worst thing I had ever been involved in," namely, the occupation of the U.S. Capitol by pro-Trump demonstrators on January 6, 2021.  (Letter of Adam Weibling, Ex. A, at 1.)  He has taken responsibility for the Class B misdemeanor of Parading or Demonstrating, for speaking into a microphone in the Rotunda while knowing his presence there was not authorized.  With the support of his wife of 15 years, family, friends, and church, Mr. Weibling overcame an initial, brief period of denial while processing the dreadful nature of the January 6th riot.  In accepting punishment, Mr. Weibling is grateful for the chance now to bring his conduct into line with the rule of law in this country, his Christian faith, and his own ethos of trying to heal the divisions between people.  As this Court decides on the extent of punishment minimally necessary for him,

the facts set forth below will reveal the man behind the illegal act always has had a "heart of gold" — especially, and remarkably so, *even on January 6th*.

There is no other case of which undersigned counsel is aware in which a January 6th defendant repeatedly went to dramatic lengths to protect a series of police officers from harm, as did Mr. Weibling. Video footage from both U.S. Capitol Police ("USCP") surveillance and amateur sources tell a consistent story: He intervened as a peacemaker on numerous occasions when violent protestors assaulted or otherwise overwhelmed police, or in one case, when protestors confronted each other. Mr. Weibling's presence first at the Columbus Doors, and then inside the Capitol Building, resulted directly from his impulse to help defuse the escalating confrontations he was observing. *Video shows he was literally yanked by his neck through the threshold of the Columbus Doors by a protestor assaulting the officer he was shielding.* His protective impulse was misguided in that Mr. Weibling should not have been there at all. Yet he did not contribute to the violence and destruction at the Capitol — to the contrary, he saved multiple others from bodily harm, while placing himself in harm's way to do so. Put simply, at the Capitol Mr. Weibling was showing his inclination to behave like a sheepdog, not like a wolf.

As to Mr. Weibling's episode with the mic inside the Rotunda, this offense conduct does not reflect the person he is today, nor the person he worked hard to become over the years since a difficult youth and early adulthood, described below. After a particularly turbulent time about 15 years ago, Mr. Weibling set about building stronger relationships, a family, community life, and a livelihood — all positive influences which this Court can now bolster by giving him straight probation as U.S. Probation recommends. (ECF No. 50.). The strength of Mr. Weibling's relationships shine in the letters from family and friends attached hereto as Exhibits B through I,

in which his father-in-law, for example, writes that Mr. Weibling's "everyday life demonstrates peace, patience, kindness, and self-control." (Letter of Billy Lowery, Ex. B.)

The Government's memorandum (ECF No. 47), which recommends two weeks of jail time, largely ignores or downplays the extraordinary facts that inure to the benefit of Mr. Weibling at sentencing.  The Government's rhetoric lamentably lumps Mr. Weibling in the same boat with rioters who committed acts of assault, property destruction, and other downright terror. Similarly, the Government is prone to draw unjustifiable conclusions against Mr. Weibling based on his personal history and outdated characteristics.  The Government's desired outcome of jail time for Mr. Weibling makes even less sense when considering sentences imposed so far on similarly situated defendants.  Roughly half of all those convicted in the U.S. Capitol cases of one count under 40 U.S.C. § 5104(e)(2)(G) have received no jail time, but the Government finds no place for Mr. Weibling among that half — even arguing against doing such an analysis.

The Court should reject viewing Mr. Weibling in this harsh light.  Of the roughly 1,000 people who have been arrested so far for their roles in the events of January 6th, mitigating facts place Mr. Weibling at the far end of the continuum — an outlier, and a good Samaritan, albeit one who slipped into illegally demonstrating before he could safely leave the building.  A chastened Mr. Weibling is in no need of jail, and should serve 12 months straight probation.

## II.   FACTUAL BACKGROUND

### A.   Events Leading Mr. Weibling Up the Capitol Steps

Like the vast majority of the people who converged on Washington, D.C. on January 6th, Mr. Weibling had supported former President Trump's re-election and harbored serious doubts about the integrity of the 2020 election results.  His social media posts leading up the protests

included criticism of Congressional officials, but he said nothing that the Government contends went beyond political hyperbole or figures of speech, and that crossed the line into conspiratorial planning with others or calls for real violence, destruction, or lawless invasion of the Capitol.

As part of a group that included his wife, Brittney, Mr. Weibling travelled to Washington, DC to attend the permitted rally led by former President Trump at the Ellipse south of the White House. (Ex.A, at 3.) After that rally concluded, they left for what Mr. Weibling understood was another *permitted* rally across from the U.S. Supreme Court at 2 pm.  (*Id*.)  This later rally was why Mr. Weibling was down around the Northeast side of the Capitol complex grounds.   (*Id*.) He understood that rally was being cancelled around the time he began to focus on the disturbances at the Capitol Building, and his group went to look.  (*Id*.)  After drawing closer to the building, at a certain point Mr. Weibling decided to climb the steps, leaving behind his wife and friends, to attempt to de-escalate the confrontations he was seeing. (*Id*.)

### B.    Events From the Capitol Steps, Into the Capitol Building

Mr. Weibling manifestly acted on this humane purpose he had for inserting himself into the melee developing at the Capitol, repeatedly coming to the assistance of officers as was captured in a series of amateur and surveillance videos taken on the steps outside the Columbus Doors and from inside those doors.  Mr. Weibling can be spotted throughout these videos wearing simply a tan jacket — most certainly *not* dressed for combat with a mask, or a helmet, or equipped with a walkie-talkie, or armed with anything.

At some point while still on the outside of the Columbus Doors, Mr. Weibling helped a Caucasian officer looking hurt by chemical irritant and pressed against the building, as was captured on an amateur video (Compilation of Videos, Exhibit J, Track 1 - Edited amateur video

4

Youtube /watch?v=WUB814y5ns0.)[1]  As the crowd was pressing forward, the officers were being crushed behind their shields, Mr. Weibling started asking people to help one officer get out. It is Mr. Weibling's voice likely speaking those words to "let him out" at 18:56 of the amateur video.  (Ex. A, at 3.)  In the following screenshot from the video, Mr. Weibling is seen just to the left of the afflicted officer, this before wheeling him around to exit to the side:



(Ex. J, Track 1 (screenshot).)

Around the same time, another sequence atop the steps outside the Columbus Doors captured in amateur video shows Mr. Weibling at a distance from the doors observing vicious flag-pole assaults on officers, to which he responded by pushing forward through the crowd in the direction of the assaults.  (Ex. J, Track 2 - Edited amateur video ProPublica.)  Linked up with his subsequent actions, these events clearly set the stage and show *why* Mr. Weibling drew right up to the threshold of the Capitol Building.  Below, side by side, are two still shots a short time

---

[1] Exhibit J contains amateur video tracks that are not subject to the Protective Order in this case and are filed with the Court on a blue flash drive. Exhibit J also contains surveillance video tracks that are subject to the Protective Order and to Mr. Weibling's contemporaneously-filed motion to seal. The full version of Exhibit J, containing both the publicly available and sealed video tracks, is filed with the Court on a red flash drive.

apart in this video, as edited by Mr. Weibling's defense team.  On the left, Mr. Weibling is looking in the direction of the flagpole attacks and then on the right as an intense spate of attacks unfolds, Mr. Weibling was weaving through those in front of him towards the stricken police.



(Ex. J, Track 2 (screenshots at 0:11 and 0:49).)

At 2:38 PM, as both amateur video and surveillance video show, the Columbus Doors burst open from the inside, bringing forth more attackers who launched themselves at police by the Columbus Door.  Mr. Weibling, rather than charging inside the Capitol Building once given an opportunity, instead formed a protective buffer between one officer and his attackers at the door, repeatedly raising his hand to block flagpole blows coming at the officer from behind him. (Ex. J, Track 3 (Edited amateur video p0H87X6eY5GSRC_E), Track 4 (Edited surveillance video 7029 USCS 02 Rotunda Door Interior 1 (under seal), and Track 6 (Surveillance video 7216

USCH 02 Rotunda Lobby East Stairs (under seal).)[2]  Here below is Mr. Weibling deflecting the

flagpole, captured in a screenshot from the amateur video edited by his defense team:



(Ex. J, Track 3 (screenshot at 1:33).)

Mr. Weibling fended off several flagpole attacks at the Columbus Doors, as best seen

with edited USCP surveillance video. (Ex. J, Tracks 4 and 6 (under seal)).  The action is best

viewed in slow motion on the edited videos, but here is a screenshot of the third defensive block:



_____

[2] As noted above, surveillance video tracks from Exhibit J are found on the red thumb drive that
is lodged under seal with the Court and is a subject of the contemporaneous motion to seal.

(Ex. J, Track 4 (screenshot at 3:16) (under seal).)

Then — most remarkably for a defendant initially charged with unlawfully entering and remaining in the Capitol — multiple camera angles show that Mr. Weibling was yanked *inside* the Capitol Building by a rioter who placed an arm around his neck while he was in the threshold of Columbus Doors trying to protect the officer from ongoing attack.  Here below is the moment the rioter's arm yanked a pained Mr. Weibling inside, captured in a screenshot of edited video:



(Ex. J, Track 3 (screenshot at 2:03).)

Notwithstanding the Government's contrary assertions, Mr. Weibling was jostled about in the threshold but was not yet fairly inside the building *until he was yanked inside*.  The camera angles better showing Mr. Weibling's positioning during this attack are from USCP surveillance

video. (Ex. J, Tracks 4 and 6 (under seal).) Here is a screenshot from a surveillance camera video

as the white arm of the attacker in the red hat goes around Mr. Weibling's head (at top center)

about to yank him in by the neck:



(Ex. J, Track 4 (screenshot at 3:28) (under seal).)

The man behind Mr. Weibling not only drags him in and off to the side but also then

punches at the officer over Mr. Weibling's shoulder.  (Ex. J, Track 6 at 2:39:20 PM (under seal).)

Interior surveillance cameras show that, once yanked inside the building and off to the

left (i.e., to the north) of the Columbus Doors, Mr. Weibling continued to try to protect the same

officer for over a minute of intense action.  Close analysis of his movements on the edited

surveillance video from this fray show him with a crowd at his back trying to "box out" rioters

near the officer — even confronting one rioter over a bottle of liquid that the rioter kept waving

in the officer's face.  (Ex. J, Track 4 (under seal).)

This officer later recalled that some rioters during this time period were attempting to

protect him, though the officer did not specifically identify Mr. Weibling.  (Redacted FBI 302

Interview of USCP Officer, Ex. K (under seal).)  While the Government now claims that Mr.

Weibling effectively prevented the officer from doing his job, the Government long ago backed

off from alleging that such was Mr. Weibling's *intent*, and does not argue so now.

Mr. Weibling took all of the preceding protective actions for the officer while overcoming

pain seen continuously in his wincing face.

**C.    Mr. Weibling's Continued Presence Inside the Capitol Building**

When Mr. Weibling eventually parted with that officer he had been protecting, he

clutched his head for several seconds, as shown on the right of this surveillance screenshot:



(Ex. J, Track 4 (screenshot at 6:52) (under seal).) He was suffering from a spray of chemicals and

a blow or blows to the head, as indicated by his clutching motions.

A few seconds later, Mr. Weibling dabbed his eyes with his coat and then looked back at

the Columbus Doors, where there was still a crowd visible outside, still in the process of flowing

towards and into the doorway.  One screenshot captures this moment as he tried both to recover

from the lengthy physical trauma he had just experienced and to decide where to move next:



(Ex. J, Track 4 (screenshot at 6:52) (under seal).)

At this moment, Mr. Weibling did not think he had a safe opportunity to leave the Capitol Building.  (Ex. A, at 3.)  After the melee Mr. Weibling had just been in, his natural reaction was not to struggle his way out through that crowd just beyond the Columbus Doors.  (*See* Ex. A, at 3.)  After this, he instead turned and walked into the Rotunda.  In the 90 seconds that follow, a huge throng of people flooded through those doors. (Ex. J, Track 4 (7:00 to 8:32) (under seal).)

Mr. Weibling later returned and attempted to leave the building, but was thwarted by the throng of people still rushing in. (Ex. J, Track 7 – Surveillance video 7029 USCS 02 Rotunda Door Interior 2, at 2:46:13 to 2:46:47 PM (under seal).)  (Ex. A, at 4.). At one point, Mr. Weibling asked an African-American female officer:  "Can we leave?"  (*Id.*)

Before he could leave the Capitol Building, Mr. Weibling committed the offense conduct of speaking into the microphone in the Rotunda.

Also while in the Rotunda, Mr. Weibling continued his previous series of interventions on behalf of police, and attempted to stop a man who was violently engaging with a line of police officers. (Ex. J, Track 8 – Edited body-worn camera video FBI Investigation-Agent Poston-BWC

of Rubin, B.)  As seen in the following still shots, Mr. Weibling came before the officer wearing

the body camera while trying to interfere with a protestor holding a camera:



(Ex. J, Track 8 (screenshot at 0:34).)

Mr. Weibling then tried to block the protestor's hand as it grabbed an officer's baton

during an intense struggle:



(Ex. J, Track 8 (screenshots at 0:34 and 1:26).)

During these moments Mr. Weibling was being pushed from behind. (Ex. A, at 4.)

Mr. Weibling returned again one more time to wait by the Columbus Doors. At last, Mr.

Weibling finally succeeded in waiting long enough to leave, once the crowd was able to move

back out of the Columbus Doors to the exterior. (Ex. J, Track 5 - Edited surveillance video 0686

USCH 02 Rotunda Door Interior, 3:25 to 3:48 (under seal).)

### D.       Mr. Weibling's Other Good Deeds Outside the Capitol Building

After leaving the Capitol Building, Mr. Weibling helped break up a fight between protestors, as captured on an amateur video. (Ex. J, Track 9 - Edited amateur video 266T-LA-3372357_0000085_1A0000049_0000001.)  Despite the physical suffering he had experienced in the previous hour, Mr. Weibling's pacifying motivation caused him to insert himself once more. After one protestor wielded a cane at another on the steps down from the Capitol, Mr. Weibling attempted to calm the violent man by being friendly, saying it's OK, it's over, and following him in case he might engage the other protestor again.   (Ex. A., at 4.) This still shot shows the start of the scene he tried to de-escalate:



(Ex. J, Track 9 (screenshot at 0:07.)

Finally, at some point *before* Mr. Weibling was in the Capitol Building he came to the rescue of *yet another* police officer in distress. Mr. Weibling saw an African-American officer's eyes start to roll, and his legs start to shake, experiencing some kind of serious distress and collapse in front of Mr. Weibling. (Ex. A., at 4.)  Mr. Weibling started shouting:  "This officer

here needs help, he's going to collapse," as the officer sagged, but Mr. Weibling got him the

attention of his fellow officers who carried him away to safety.  (*Id.*)  In late 2021, soon after

being charged in this case, Mr. Weibling recognized this officer from amateur video on the steps

of outside the Columbus Doors as being the one he assisted:



(Screenshot of Officer L. from Amateur ProPublica video, Ex. J, Track 2.)

On this occasion, Mr. Weibling's rescue effort itself was not captured by any video that

counsel can locate.  However, in an interview by a defense investigator in October 2022, Officer

L. confirmed his identity as the officer in the photo.  (Redacted October 2022 Interview of

Officer L., Exhibit L attached hereto.)  Officer L. also recalled having suffered moments of

distress earlier outside the Capitol in which he had been crushed and was blacking out (or

"passing out" or "going down"), and needed to be carried to safety by fellow officers. (*Id.*) These

statements corroborate to a significant extent Mr. Weibling's prior recollection.[3]

---

[3] Undersigned counsel brought this matter of Officer L.'s rescue by Mr. Weibling to the attention
of the Government as mitigating information back in September 2021. This incident is not the
subject of any FBI or police report, let alone video, known to the defense. Police who carried
Officer L. to safety remain unidentified, and his supervisor declined a defense request for an
interview.

III.     **APPLICABLE LEGAL STANDARD**

Section 3553(a) of Title 18 of the United States Code tasks this Court with considering the statutory sentencing factors before imposing a sentence that is "sufficient, but not greater than necessary," to accomplish the purposes of punishment set forth at 18 U.S.C. § 3553(a)(2) (A)-(D). Those factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (b) to afford adequate deterrence to criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . (5) any pertinent policy statement issued by the Sentencing Commission . . . (6) the need to avoid unwarranted sentence disparities among [similar] defendants . . . and (7) the need to provide restitution to any victims of the offense.

18. U.S.C. § 3553(a).

In applying the factors, this Court has "wide discretion" to ensure that the punishment "fit[s] the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1994)). Indeed, "the sentencing judge [is] to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* (internal quotations and citations omitted).

IV.     **THE PRESENTENCE INVESTIGATION REPORT**

On February 27, 2023, the U.S. Probation Department ("Probation") issued its revised presentence investigation report, (ECF No. 49), and accompanying sentencing recommendation,

(ECF No. 50), grounded expressly in Probation's consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a). After interviewing and investigating Mr. Weibling, and considering the specifics of Mr. Weibling's conduct on January 6, 2021, Probation recommended twenty-four months' probation, $500 in restitution, and a $2,500 fine. (ECF No. 50, at 1.) Probation recommended no period of incarceration[4] and remarked: "Much to his credit, the defendant did not engage in violence during the Capitol Riot." (*Id.*)

## V.    A SENTENCE OF PROBATION WOULD ACCORD WITH SECTION 3553(a)

In consideration of the § 3553(a) factors, we respectfully submit that this case warrants a sentence of straight probation. Mr. Weibling deeply regrets his involvement in the events of January 6, to which he pled guilty on July 14, 2022. He readily acknowledges that even his unplanned and relatively minor participation in the events of that day — which he now understands to be unprecedented "riots" that "were nothing but a stain on this country's legacy" — warrant punishment. (Ex. A, at 1.) We submit, however, that a custodial sentence does not comport with the purposes of sentencing in this case. We discuss the relevant § 3553(a) factors below.

### A.    Mr. Weibling's History and Circumstances Weigh in Favor of Probation

Mr. Weibling is dedicated to his family and to moving his life forward in a conscientious manner, as letters from his wife Brittney, friends and family, and Mr. Weibling himself attest.

---

[4] Contrary to Probation's recommendation, the government seeks two-week's incarceration in addition to probation. Such a compound sentence is impermissible and was rarely (if ever) imposed for this type of offense prior to January 6, 2021. *United States v. Panayiotou*, __ F. Supp. 3d. __, 2023 WL 417953, Jan. 25, 2023, at *9 (D.D.C.). Nonetheless, so long as this Court does not impose a period of incarceration longer than two weeks, it can appropriately be considered intermittent confinement as a condition of probation.

(*See* Exs. A - I.)  As outlined below, these family circumstances along with Mr. Weibling's commitment to self-improvement, church, and professional development mitigate in favor of probation. *See* 18 U.S.C. § 3553(a)(1).

### 1. Family relationships and mutual support

Mr. Weibling enjoys a strong, loving relationship with his wife of fifteen years, Brittney Weibling, and supportive, close relationships with each of their extended families. (Letter of Brittney Weibling, Ex. C.) Brittney's grandmother describes Mr. Weibling as "a blessing to [her] life." (Letter of Mrs. Barbara Potter, Ex. D). His father-in-law, who has had "the joy of spending lots of time with Adam," writes that he "is very intentional in making time for both his wife and extended family." (Ex. B.)

A handful of years ago, Mr. Weibling and his wife moved from Washington State to Texas to live near her family. (Ex. C.) Since relocating to Texas, Mr. Weibling has shown himself to be a generous, caring relative. He "helped his grandparents through their final days as well as Brittney's grandmother during the passing of her husband." (Letter of Beth Weibling, Ex. E; *see also* Ex. D (Adam "was by my side daily driving me to the hospital and then staying with me during the day while my husband was in the ICU.").) "He has counseled Brittney's siblings as they have gone through adult challenges." (Ex. E.) "During the pandemic . . . he even jumped on a plane to help his brother through a very trying medical illness," (*id*), "and stayed there for over a month," (Letter of Kelly Hutchinson, Ex. F).

███████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

Mr. Weibling does not take his family relationships for granted and is thankful that their support continues in the wake of his conduct on January 6. "He has had the support of his siblings and extended family on both sides as well as friends." (Ex. E.)

We submit that Mr. Weibling's desire to care for his wife, the children they hope to have, and his extended family on both sides will motivate him to rise above the circumstances he now faces to benefit his family and community.

## 2. Commitment to personal development, self-reflection, church, and work

The son of loving and involved adoptive parents, Mr. Weibling "has a great heart," but struggled in childhood and youth with "certain social situations" and "how to interact with people." (Letter of Mr. Dennis Weibling, Ex. G.) As Mr. Weibling's father puts it, when Adam was a young child "we noticed that while his intellectual intelligence was high, his emotional intelligence was low." (*Id.*) As Mr. Weibling grew up, his difficulty reading social cues caused him frustration. During youth and young adulthood, he was prone to physicality, and he comes before this Court with a history of four misdemeanor arrests for assault. (PSR ¶¶ 22 - 26.). Mr. Weibling's wife writes that "there were times in the early years of [their] marriage when things were very difficult." (Ex. C.) These events took place between 2008 and 2010, when Mr. Weibling (now age 40) was 25 to 27 years old, and prompted in him a serious, daily and lifelong effort to increase his social-emotional skills, improve his ability to interact in social situations,

and forge strong connections with family and friends. (*See* Ex. A.) Today, Mrs. Brittney Weibling is proud of the man her husband has become "through hard lessons and much work." (Ex. C.) Without a doubt, Mr. Weibling's decision to approach the Capitol on January 6, 2021 was an enormous misstep. But it is one that reflects a terribly executed desire to help, not "a backpedaling of his hard-earned personal growth." (*Id.*)

Mr. Weibling's practice of self-reflection extends to the events underpinning this case. As expressed to his wife, he "has made the choice to view this situation as an opportunity to search himself, learn, and further grow as a person." (Ex. C.) Specifically, Mr. Weibling (a) removed himself from social media channels he realized were problematic (discussed below in connection with acceptance of responsibility), and (b) grew in his dedication to church and community. Mr. Weibling now attends church weekly with his wife (and often with their neighbors, Chris and Kelly Hutchinson), (Ex. F), and participates in the men's ministry, where he spends multiple hours at least two days each week receiving formal mentorship and teachings from church leadership, (Ex. C). He volunteers regularly at the church and recently completed a men's weekend retreat. (*Id.*) Mr. Weibling "shared [his] involvement in January 6th" with his church community: "I felt it was necessary to be open and transparent with my guilt if I was going to truly take responsibility for my actions." (Ex. A.) Those close to Mr. Weibling observe that his involvement with church is "positively influencing his decisions and priorities." (Ex. G.)

Mr. Weibling's dedication to self-improvement extends also to remaking his career. After losing his job when this case was reported publicly, Mr. Weibling started a lawn care business to contribute to his family's livelihood. (Ex. A). He hopes, moreover, to grow that business sufficiently so that he can employ others and support his community in that way. (*Id.*)

**B.      The Nature and Circumstances of the Offense Support a Term of Probation**

**1.    <u>Mr. Weibling's role in the events of January 6 was minor, unplanned, and largely well-intentioned</u>**

Mr. Weibling is guilty of Parading and Demonstrating, by taking someone else's microphone in the Capitol Rotunda, where he knew he had no permission to be, and speaking to the others present for less than one minute.  Across the continuum of actions by protestors in and around the Capitol on January 6th, this conduct is minor and is properly punished by a non-custodial sentence, no more than straight probation.

As shown above in Section II, Mr. Weibling also did not plan on making this speech in the Rotunda.  He was on his way to a permitted rally across from the Supreme Court, not to storm the Capitol, when he inserted himself into the chaos at the Capitol.  He was in the Rotunda because he was yanked by his neck into the Capitol Building in the first place, and he was not thereafter in a good position to find his way out before he walked out less than an hour later.  Unfortunately, in the meantime, he succumbed to an act that the law forbids.

Finally, Mr. Weibling's motivations for being in the threshold of the Columbus Doors entrance were well-intentioned (albeit misguided).  He was concerned about the potential for violence and injury, and, when he saw that violence and injury were indeed happening, he came to the assistance of police officers -- and became the object of violent attack himself.  Mr. Weibling should have left the defense of the Capitol and its personnel to the authorities, but he certainly had no intention of blocking the officers from their duties.  The Government claims no such intent. Mr. Weibling was only trying to save them from assault and from medical distress –

and he did, multiple times.  He did not share the mob's mentality — he was trying to be an ally of the police against violent rioters and looters.

## 2.  **Mr. Weibling accepts responsibility**

In asserting his minor and mitigated role in the events, Mr. Weibling in no way minimizes the seriousness of January 6, 2021. His conduct in this case violated, among other things, his faith and the values of his family. Mr. Weibling deeply regrets what "was unequivocally and categorically the worst thing I had ever been involved in." (Ex. A.)  Having fully accepted responsibility, Mr. Weibling now recognizes that he deserves the consequences of his actions: "how desperately I needed to be humbled." (*Id.*)

Mr. Weibling's dad knows that Adam "has thought about his behavior on January 6th for many, many hours. He is regretful and blames no one but himself." (Ex. G.) "Adam has told me how stupid he was to become involved . . . in the January 6th incident," writes Mark Gregston, who taught Adam Weibling in high school and has kept in touch with him for almost twenty-five years. (Letter of Mark Gregston, Ex. H.) Mr. Gregston goes on: "I truly believe that [Adam's] contrite spirit about it has humbled this young man." (*Id.*).

Mr. Weibling has taken consistent, intentional steps to make amends with his community, learn from his mistake, and move forward in the ways that he can, even while awaiting final determination from this Court. Substantial self-reflection led Mr. Weibling to remove himself within weeks of January 6 from relevant social media channels.

The government selects certain Twitter activity as evidence that Mr. Weibling has not shown remorse or appropriately contextualized the events of January 6. (ECF 47, at 10-11). But as the government acknowledges, "on or about January 15, 2021, Weibling closed his Twitter and

Facebook accounts as no other social media posts are known." (*Id.* at 11.) The government fails to credit Mr. Weibling for the closing of his accounts, which was in and of itself an act of contrition and acknowledgment. Mr. Weibling writes in his letter to this Court:

> Reflecting back, for the first week or so, I was in denial. I even took to Twitter as I was wont to do, to express and defend my position . . . . Fairly early on, about a week or so after January 6th and many months before I was arrested, I completely divorced myself from not only my online political discourse but also from the news and politics in general, which I realized had become toxic for me. I had been pulled into a polarized world where people pushed fear, anger and division, and it had led me to a place I never should have been.

(Ex. A.) This reckoning took place long before Mr. Weibling had any indication that he would be arrested or face legal repercussion of any kind. At bottom, therefore, Mr. Weibling's actions after January 6 vis à vis his Twitter account demonstrate not a lack of remorse, as the government claims, but a self-directed effort to learn from his mistake and take action to ensure that he never again engages in similar conduct.

### C.    A Term of Probation Would Provide Just Punishment, Reflect the Seriousness of the Offense, and Promote Respect for the Law

A term of probation would be sufficient, but not greater than necessary, to provide just punishment, to reflect the seriousness of Mr. Weibling's offense, and to promote respect for the law. *See* 18 U.S.C. § 3553(a)(2)(A). As discussed above, Mr. Weibling has undertaken serious self-reflection in the years since January 2021. This reflection led to changes in conduct — such as removing himself from social media and increasing his connection to his local church — and changes in attitude, as reflected in his letter to the Court:

- The riots on January 6th were nothing but a stain on this country's legacy. To be honest, at first I didn't want to see that.

- Through a humbling journey of self-discovery, I came to realize that in my pride and foolishness I had not only participated in breaking the law, but also defended the indefensible after January 6th on Twitter.

- As I now understand the significance of the events of January 6, I am blown away to realize that this is one of a small number nations in the world where I still have rights.

- I now see that the rule of law itself was at play on January 6, and we should all be grateful that we have a government that enforces law and order. I am grateful to the court and even to the prosecution.

(Ex. A.) Without a doubt, this case and the events following January 6, 2021 already have given

Mr. Weibling newfound respect for the law and all that it protects.

Probation, taking into account the § 3553(a) factors, determined a sentence of probation

the most appropriate outcome in this case. We urge the Court to share that view. Indeed, Mr.

Weibling already has pleaded guilty, attempted to pre-pay restitution, and continues to comply

with all the terms of his pretrial release.

### D.    A Term of Incarceration Will Not Materially Promote Deterrence

In the circumstances of this case and defendant, we respectfully submit that a sentence of

probation would serve the purpose of deterrence. *See* 18 U.S.C. § 3553(a)(2)(B).

With respect to specific deterrence, Mr. Weibling's commitment to self- reflection and

personal growth, and his relationships with family and church, demonstrate that he is now in a

place in his life where there is scant risk of recidivism. In Mr. Weibling's own words: "I have

been blessed with a truly great life, and while I cannot take back the past, I believe I have every

reason and responsibility to make the best of the time I have left by making a positive impact on

my family and my community." (Ex. A, at 3.)

Moreover, as to the effectiveness of deterrence generally, research consistently has shown that the certainty of being caught and punished has a deterrent effect, but "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.* *See also* Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime, 8 Cardozo J. Conflict Resol. 412, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

A reasonable person in the community viewing this case would understand its significant cost to Mr. Weibling, independent of a prison term. Indeed, his neighbor, Kelly Hutchinson observes that "there has been a huge financial toll on his life" and that "he has already suffered a lot." (Ex. F). No rational person would take any message from this case other than that similar conduct risks difficult, fundamentally life-changing results.

### E.      A Sentence of Probation Would Prevent Sentencing Disparities

The government underscores at length that this Court enjoys wide discretion to impose a sentence "sufficient, but not greater than necessary, to comply with the" purposes of sentencing. 18 U.S.C. § 3553(a); Gov't mem. at 16. The government of course is correct. The Supreme Court has instructed, as this Court well knows, that the punishment must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011). But the government's focus on discretion appears to be aimed at encouraging this Court to impose a more severe sentence on Mr. Weibling than on other similarly situated January 6 defendants. This encouragement comes notwithstanding section 3553(a)(6)'s instruction that the Court "avoid

unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Remarkably, in other January 6 cases (including those the government references specifically in its brief), the government has written:

> Thus, even though many of the [January 6] defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

*E.g.*, *United States v. Paul Colbath*, 1:21-CR-650 (RDM), (ECF No. 28, at 16).

For avoidance of doubt, courts have taken various approaches to sentencing January 6 defendants, accounting for each individual situation and defendant. As of February 7, 2023:

- Approximately 408 defendants had been sentenced for charges in connection with the events of January 6, 2021.
- Approximately 263 of those January 6 sentences had been in cases (like this one) of a one-count violation of 40 U.S.C. § 5104(e)(2)(G).
- In approximately 43 of those 263 cases — 16% — the government did not seek a custodial sentence; and in approximately 220 of the 263 § 5104(e)(2)(G) cases, the government did seek incarceration.
- Courts sentenced these defendants to incarceration in less than half of the cases in which the government sought it.
- In approximately 128 cases, the government sought incarceration, but the court declined to impose such a sentence, opting instead for a period of probation, home detention, community service, and the like.

By no means is a custodial sentence typically imposed in § 5104(e)(2)(G) cases, and outside of this specific case, the government generally encourages courts to view the January 6 cases as related for purposes of sentencing.

Here, the government calls out three January 6 sentencing decisions. In only one of the government's selected cases did it seek a sentence of incarceration. That was *United States v. Boyd Camper*, 21 Cr. 325 (CKK), in which the defendant destroyed video and audio evidence and expressed no remorse (repeatedly telling the FBI that he had done nothing wrong), in

addition to claiming to help prevent violence during the riot. In *United States v. Matthew Mazzocco*, 21 Cr. 54 (TSC), where the defendant entered the Spouse's Lounge along with the Rotunda and attempted to help during the riot, the government did not request incarceration. The court ultimately imposed a sentence of 45 days, finding that the defendant did not independently find remorse (as Mr. Weibling did), but showed remorse only after he realized he could get in trouble for his actions. Finally, in *United States v. Paul Colbath*, 21 Cr. 650 (RDM), where the defendant assisted a rioter who had been sprayed with chemicals, stayed inside the Capitol for 5 minutes, did not appear to post about January 6, and readily admitted his guilt, the government requested and this Court sentenced the defendant to 30 days' home detention.

The government goes to long lengths to encourage this Court to impose a sentence out of line with similarly situated defendants, and relies on cases that serve only to demonstrate why the circumstances of Mr. Weibling's case do not call for any period of incarceration.

## VI.    MR. WEIBLING WILL PAY RESTITUTION AND A FINE IS INAPPROPRIATE

Mr. Weibling is ready to pay the $500 in restitution to which he agreed when he pleaded guilty. Indeed, Mr. Weibling attempted though his undersigned counsel to pre-pay restitution promptly after signing his plea agreement. (His check was returned by the Clerk of Court.)

Imposition of additional economic consequences to Mr. Weibling by way of a fine is unnecessary. The government does not seek a fine. Moreover, Mr. Weibling already suffered substantial economic impacts because of his conduct on January 6. When his arrest made the news, he and his wife both lost their jobs. Mr. Weibling has not been able to find a new position in his same line of work. These economic consequences more than satisfy the purpose of a fine.

We urge this Court to impose a sentence that reflects Mr. Weibling's limited, well-intentioned involvement in the events of January 6 and his efforts to make amends with the government and his community.

## VII.   CONCLUSION

For all of the reasons set forth above, we respectfully request that this Court sentence Mr. Weibling to a short term of probation.

Respectfully Submitted,

/s/ Bruce H. Searby
Bruce H. Searby (DC #1012382)
SEARBY PLLC
2000 P Street, NW, Suite 705
Washington, D.C. 20036
Tel: (202) 750-6106
Fax: (202) 849-2122
bsearby@searby.law

COUNSEL FOR DEFENDANT
ADAM WEIBLING

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of April 2023, true and genuine copies of REDACTED

SENTENCING MEMORANDUM ON BEHALF OF ADAM WEIBLING and its exhibits were

filed on this Court's CM/ECF system, which will serve a copy on all counsel of record.

Respectfully submitted,

/s/ Bruce H. Searby_____
Bruce H. Searby (DC #1012382)
SEARBY PLLC
2000 P Street, NW, Suite 705
Washington, D.C. 20036
Tel: (202) 750-6106
bsearby@searby.law